IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

OPHEIM V. OPHEIM

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DAYSHA RENEE OPHEIM, ALSO KNOWN AS DAYSHA STONE, APPELLANT,

V.

DAMON ROSS OPHEIM, APPELLEE.

Filed October 25, 2016.    No. A-15-1153.

Appeal from the District Court for Sarpy County: MAX KELCH, Judge. Affirmed.

Daysha Stone, pro se.

Donald A. Roberts, of Lustgarten & Roberts, P.C., for appellee.

Patricia J. Bramhall, guardian ad litem.

MOORE, Chief Judge, and PIRTLE, Judge, and MCCORMACK, Retired Justice.

MCCORMACK, Retired Justice.

## I. INTRODUCTION

Daysha Renee Opheim, also known as Daysha Stone, appeals from the order of the district court granting Damon Ross Opheim's application to modify the parties' decree of dissolution of marriage with respect to custody of their two daughters and child support. On appeal, Daysha argues that the district court disregarded and improperly weighed the evidence at trial, that the court made erroneous evidentiary rulings, that the court erred with respect to the temporary order entered while the case was pending, that the parenting plan was incomplete, that the order of child support was in error, and that the modification of custody was not in the children's best interests. Upon our review, we find no merit to Daysha's assertions on appeal, and we affirm.

## II. BACKGROUND

Daysha and Damon were married in February 2003 and divorced in June 2009. Daysha was awarded custody of the parties' two daughters, Oasis, born in 2005, and Alexis, born in 2006. Damon was granted parenting time with the girls and ordered to pay child support. In 2011, the decree of dissolution was modified with respect Damon's summer parenting time and child support obligation.

On October 1, 2014, Damon filed a second complaint for modification which is the subject of the present case. In the complaint, Damon alleged that a material change of circumstances had occurred in that Daysha was the subject of a juvenile court case, the children had been removed from Daysha's care and placed with Damon, and Daysha had serious mental health issues. Damon requested sole custody of the children and an abatement of his child support obligation.

A trial was held on Damon's complaint to modify. At the trial, Damon presented testimony of Daysha's erratic and strange behavior, including testimony from neighbors, a teacher, a DHHS worker, and various exhibits. Daysha presented her own testimony and the testimony of the children's guardian ad litem.

### 1. NEIGHBORS' TESTIMONIES

Jennifer Kastens testified that she lives across the street from Daysha's house in Omaha. Kastens testified about a fall 2014 incident in which she witnessed Daysha act inappropriately toward Alexis. Kastens testified that she heard a child crying and looked over to see Daysha in the driveway with both daughters. According to Kastens, Alexis was crying and Daysha hit Alexis in the kidney area "hard enough that she not lifted but moved when she hit her." Kastens testified that Daysha then grabbed Alexis by the arm, dragged her up the front steps as the girl cried, "no, momma, no" and shoved her inside. According to Kastens, Daysha then left with Oasis on their bikes for approximately 45 minutes. Kastens testified she called the police.

Kastens also testified that she had seen Daysha use a video camera to record events in the neighborhood. According to Kastens, Daysha would videotape while Kastens or her roommate walked the dog.

Another neighbor of Daysha's, Kaci Meyers, testified that her stepdaughter used to play with Oasis and Alexis. Meyers testified that Oasis and Alexis were never well taken care of, appeared dirty, and were hungry when they attended her stepdaughter's birthday party in 2013. Meyers described the girls as "somber."

Meyers testified that Daysha once asked Meyers to watch Oasis and Alexis while she went to an interview. Daysha was gone for hours longer than she promised without providing any contact information. According to Meyers, when Daysha returned, she did not come retrieve the girls, but just went into her house.

Meyers also testified that Daysha would record things from the moment she walked out of her door. Meyers called the police several times because Daysha would record Meyers' children. Meyers also testified that Daysha put fliers on her door about "gang stalking." In September 2014, Daysha began accusing Meyers of harassing and stalking her. According to Meyers, Daysha told another neighbor that Meyers and her husband were in a satanic cult and would sneak into Daysha's house to smear blood on her walls. Meyers testified that she moved from the neighborhood because she did not feel safe living next to Daysha.

Candice Dansou testified that she was also a former neighbor of Daysha's. Dansou petitioned and was granted a harassment protection order against Daysha because Daysha had been coming onto Dansou's property and distributing fliers. The fliers accused other neighbors of being in a satanic cult and discussed the color red "desensitizing" people. Dansou asked Daysha to leave her property many times. Daysha called the Dansous "gang stalkers" and would yell at Dansou for not listening to her. Dansou also testified that Daysha began filming Dansou's children on camera and posting the videos online.

## 2. DAMON'S OTHER EVIDENCE

Damon also called Nicole Woodward, a teacher with the Omaha Public Schools, to testify. Woodward testified that she had taught both Oasis and Alexis for third grade. According to Woodward, both girls were well behaved and Daysha supported her children in doing their homework. Woodward testified that during the 2014-15 school year, when Alexis was in her class, Daysha attended an open house. Daysha informed the principal that she had been bothered by the yellow color Woodward was wearing at the open house. The principal informed Woodward that Daysha had filmed the open house because she disliked that two of the teachers and a child were wearing yellow. Woodward testified that it "very much" bothered her to be recorded without her knowledge.

Woodward also testified that on September 9, 2014, Daysha wrote in Alexis' daily planner, "Fightgangstalking.com (Fight evil)." Woodward testified that she visited the website and that it included information about not trusting the government, the police, or people of authority. Woodward also testified that the website included videos discussing the various colors people wear and watching people. She was concerned that Daysha had recorded the open house for a purpose related to the website.

According to Woodward, Daysha had been banned from school property for handing out information about gang stalking to both parents and students. After her ban, Daysha continued to record events at the school from across the street.

Damon also called Rebecca Debban, an initial assessment worker for the Nebraska Department of Health and Human Services. Debban testified that she took a report on the Opheim girls in September 2014. As a result of the intake and her subsequent investigation, Debban filed an affidavit in support of removing Oasis and Alexis from Daysha's home. Debban's affidavit noted that DHHS had received four total intakes regarding Daysha because of concerns about Daysha's mental health and obsession with colors and gang stalking. The intakes reported that Daysha refused to let police enter her home for well-child checks and that she believed the FBI was trying to access her house. Daysha had also been reported videotaping other children and handing out literature on gang stalking at her children's school.

According to Debban's affidavit, Daysha had posted numerous videos online. One of the videos depicted Daysha refusing to let the police into her home for a well-child check. According to the affidavit, Daysha informed her children in one video not to talk to the police because they will convince them that Daysha is a criminal and will "'always trick you.'" The videos also indicated Daysha has reactions to certain colors, such as white cars.

Debban and police were able to make contact with Daysha and the girls on September 19, 2014. Daysha recorded the interaction and said she did not give permission for her children to

speak to the workers. Debban observed the home to be messy, but not unsanitary. Debban testified that the girls were unwilling to talk to her and she found this concerning.

As a result of Debban's recommendation and affidavit, Oasis and Alexis were removed from Daysha's home and placed with Damon. Debban testified that the juvenile court case against Daysha was eventually dismissed so that the district court in the current case could make a custody determination.

Damon testified at the trial as well. Damon testified that he is employed by the Air Force and currently works 8 a.m. to 4 p.m., although his hours are flexible. Damon testified that he cooks, shops, cleans, and does laundry for the girls. He testified that there was no chance he would be relocated in the future because he has changed jobs to a position where he is no longer deployed.

Damon also testified that in approximately March 2015, Daysha caused a lockdown of Bellevue Public Schools when she went to the girls' school.

Additionally, Damon presented evidence of blog posts written by Daysha. In the posts, Daysha reported being harassed by the police and the school security guard. The blog posts reflect that Daysha believed she was the target of "psychological warfare." Damon also presented evidence of several of the fliers Daysha had passed out to various individuals, as well as a note Daysha wrote to her daughters' bus driver offering to show the driver "the video that I took of how you participated in a psychological war program against me by your car being used to 'sensitize' me to the color red."

### 3. DAYSHA'S EVIDENCE

Daysha testified on her own behalf at the trial. Daysha testified that she had good intentions in handing out the fliers because she "did it out of concern for myself and others." Daysha testified that Damon was controlling and had manipulated the neighbors into testifying against her. She testified that Damon had not attended all of the girls' recitals or special events due to having to work.

Regarding the incident where Kastens witnessed Daysha hit Alexis on the back, Daysha testified that Kastens was incorrect. Daysha testified that the incident had actually involved Oasis, not Alexis, and that Daysha had only spanked her on the bottom because Oasis would not put on her bike helmet.

Daysha also testified regarding her finances. According to Daysha, she earned $15,000 in 2013 and $23,000 in 2014. Daysha testified that she is behind in paying the mortgage on her home and is currently self-employed. Daysha testified that she still has her real estate license, has recently acquired a broker's license, and is "perfectly capable of working."

When pressed on cross-examination as to why she would permit her children to be scared by keeping the doors locked during repeated police visits to the house, Daysha testified that she did so because "I had the right to do that." Daysha testified that she still believes that the information contained in the pamphlets and blog posts is "completely possible" but "I'm not going to talk about it anymore."

Lastly, Daysha called the children's guardian ad litem to testify. The guardian ad litem testified that she had no concerns about Daysha's parenting skills. On cross-examination, the guardian ad litem admitted that she had only seen Daysha in certain contexts and had no knowledge about her parenting abilities beyond those contexts.

## 4. COURT'S ORDER

Following the trial, the district court issued an order granting Damon's request for modification. The court determined that there was a material change of circumstances due to the pattern of Daysha's erratic behavior. The court found that it was in Oasis and Alexis' best interests that Damon be granted sole legal and physical custody. The court awarded Daysha parenting time and ordered her to pay $167 in monthly child support. The court based its child support calculation off of Daysha's gross monthly income of $1,250 ($15,000 annually divided by 12 months).

Daysha appeals. Additional facts will be discussed, as necessary, in the analysis section of the opinion.

## III. ASSIGNMENTS OF ERROR

Consolidated, restated, and reordered, Daysha's assignments of error are that the district court disregarded certain evidence and rendered a decision against the weight of the evidence, that the court made erroneous evidentiary rulings, that the court erred with respect to the temporary order entered while the case was awaiting trial, that the parenting plan was incomplete, that the court erred in ordering Daysha to pay child support in the amount of $167 per month, and that the modification of custody was not in the children's best interests.

## IV. STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. S*tate on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion. *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002).

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the rules, not judicial discretion, except in those instances when judicial discretion is a factor involved in the admissibility of evidence. *Boamah-Wiafe v. Rashleigh*, 9 Neb. App. 503, 614 N.W.2d 778 (2000).

## V. ANALYSIS

### 1. DISTRICT COURT'S FACTUAL FINDINGS

Daysha argues that the district court committed "judicial misconduct" by disregarding evidence and rendering a decision against the weight of the evidence. Brief for appellant at 27. Because we find that these are matters of fact-finding and credibility, we defer to the district court's determination and find no merit to Daysha's assignment of error.

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

Daysha lists numerous pieces of evidence which she claims the district court misinterpreted. However, upon our review of the record, it is apparent that the district court did not misconstrue the evidence, but rather, accepted other witnesses' testimony over Daysha's version of events. For example, with respect to the spanking incident, Kastens testified that Daysha hit Alexis in the kidney, causing her body to move. Daysha, in contrast, testified that she only swatted Oasis on the bottom. In its order, the district court referred to the incident and described it as Kastens had. It is apparent that the district court decided to credit Kastens' version of events over Daysha's.

Daysha asserts similar arguments with respect whether she recorded neighbor's children intentionally or whether they were merely in the frame as she filmed; whether DHHS performed an "investigation" or merely took her children without speaking to her; whether Candice Dansou should have been granted the protection order when Daysha was unable to attend the hearing; whether Daysha believed the police were conspiring against her; and whether Damon was the reason Daysha was taken on a Board of Mental Health hold. Daysha also argues that the district court should have given more weight to the guardian ad litem's testimony that she had no concerns about Daysha's parenting skills. Lastly, Daysha argues that the court erred in failing to find that she had "impeached" the witnesses because she presented evidence that they did not know Daysha well and that they were biased because they had been influenced by Damon.

All of Daysha's arguments in this regard relate to the district court's decision to believe one version of events over another. As the trier of fact, the district court observed the witnesses' demeanor and was in the best position to judge the veracity of their testimony. See *Schrag, supra*. We therefore find no error in the district court's factual findings or weighing of the evidence.

## 2. EVIDENTIARY RULINGS

Daysha next argues that the district court erred in failing to admit three items of evidence and in relying on improper hearsay. Because we determine that Daysha either failed to preserve error on these issues at trial or that they are without merit, we reject her argument.

As an initial matter, we note that Daysha represented herself at the trial and is also pro se on appeal. A litigant proceeding on a pro se basis is obligated to follow the same appellate rules and procedures applicable to counsel. *Cole v. Isherwood*, 271 Neb. 684, 716 N.W.2d 36 (2006).

### (a) Failure to Admit Evidence

Daysha argues that the district court erred in failing to take judicial notice of the dismissal of the juvenile court case involving Oasis and Alexis, in not making the guardian ad litem a party to the case, and in not admitting a warrant showing that Daysha was put on a Board of Mental Health hold at Damon's request. We find no merit to these arguments.

### *(i) Juvenile Court Dismissal*

Daysha first argues that the district court erred in failing to take judicial notice of the dismissal of the juvenile court case. We find no merit to this assignment of error.

At the trial, Daysha asked the district court to take judicial notice of an order of the Douglas County Juvenile Court dismissing a juvenile case involving Daysha and the girls. The court declined to take judicial notice, noting that the document was not from its own files, but from

another court in a different county. The DHHS worker testified that the juvenile case had been dismissed so that the Sarpy County District Court could make a custody determination in the present case.

As a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it. *In re Guardianship of Lavone M.*, 9 Neb. App. 245, 610 N.W.2d 29 (2000). Furthermore, even if the court erred in failing to take judicial notice of the juvenile court dismissal, any such error would be harmless because the DHHS worker had already testified that the juvenile case had been dismissed. See, *Worth v. Kolbeck*, 273 Neb. 163, 728 N.W.2d 282 (2007) (erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact). Accordingly, we find no error in the district court's decision not to take judicial notice of the juvenile court dismissal.

### (ii) Failure to Make Guardian Ad Litem a Party

Daysha next argues that the district court erred in failing to make the guardian ad litem a party to the proceeding so that she could testify regarding the children's placement preferences. The record reveals that Daysha never requested that the guardian ad litem be made a party. In appellate proceedings, the examination by the appellate court is confined to questions which have been determined by the trial court. *Watson v. Watson*, 272 Neb. 647, 724 N.W.2d 24 (2006). Accordingly, we do not consider Daysha's argument that the guardian ad litem should have been made a party to the case.

### (iii) Board of Mental Health Warrant

Lastly, Daysha argues that the district court erred in not admitting a warrant from the Douglas County Board of Mental Health. We find no merit to this assignment of error.

At trial, Daysha referred to an incident where she was detained for a Board of Mental Health hearing, held at a treatment center, and eventually released. Daysha attempted to introduce a copy of the warrant ordering her to be detained, but the court sustained Damon's hearsay objection. Daysha then testified that the "paper[] . . . gives sheriff the permission to come to my house and claims that I might be violent and call the petitioner, Damon Opheim, for more instructions how to take her in. Ex-husband should not have that much power over an ex-wife."

This record reveals that Daysha did not argue for the exhibit's admission under an exception to the hearsay rule and the court therefore correctly excluded the exhibit as inadmissible hearsay. When the opposing party objects to evidence as hearsay and the trial court sustains the objection, the proponent is required to point out the possible hearsay exceptions in order to preserve the point for appeal. *State v. Alford*, 278 Neb. 818, 774 N.W.2d 394 (2009).

### (b) Hearsay

Daysha next argues that the district court erred in admitting and relying on hearsay evidence. Daysha points to Woodward's statement regarding what the principal told her about Daysha filming her at the open house because of the color of her shirt. Daysha also argues that

Damon's complaint referred to an affidavit from DHHS which relied on hearsay. We find Daysha failed to preserve these objections for appeal.

The record reveals that Daysha did not object to Woodward's testimony regarding the principal's statements.

With respect to the affidavit, Daysha objected because "this was dismissed," apparently in reference to the juvenile case. When the court clarified that Daysha was required to state a legal basis for her objection, she objected on relevance and the court overruled her objection. Later, Daysha objected to the affidavit on foundational grounds, which objection the court also overruled.

The record reveals that Daysha has not preserved a hearsay objection to either Woodward's testimony or the DHHS affidavit. As stated above, in appellate proceedings, the examination by the appellate court is confined to questions which have been determined by the trial court. *Watson v. Watson*, 272 Neb. 647, 724 N.W.2d 24 (2006). Accordingly, we do not address Daysha's contentions regarding hearsay.

### 3. TEMPORARY ORDER

Daysha next argues that the district court erred in not including a parenting plan in its temporary order and in not hearing Daysha's motion to vacate the temporary custody order. Relatedly, Daysha argues that Damon's attorney committed "[m]alfeasance" by seeking the ex parte temporary custody order while Daysha was in the hospital. Because we determine the issue is moot, we do not address this assignment of error.

A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004).

The record reveals that Damon filed a motion for ex parte relief shortly after the commencement of the case. Damon asked for temporary custody of Oasis and Alexis and for an abatement of his child support obligation. The court granted Damon's motion following a hearing where Damon appeared but Daysha did not. Six months later, Daysha filed a motion asking the court to vacate the temporary custody order. The court denied the motion.

In *Pathammavong, supra*, the Nebraska Supreme Court addressed a similar issue involving a temporary custody order. In that case, the mother challenged on appeal the trial court's order granting the father ex parte temporary custody. The Supreme Court reasoned that "whether the temporary order was granted in error was relevant only from the time it was ordered until it was replaced by the order determining [the child's] permanent custody placement." *Id.* at 6, 679 N.W.2d at 754. Accordingly, the court concluded the issue was moot and declined to address it.

This case is analogous to *Pathammavong, supra*. Any error in the court's temporary order was relevant only until it entered the permanent order granting Damon custody of Oasis and Alexis. Accordingly, this issue is moot and we need not address Daysha's arguments with respect to the temporary order.

### 4. COMPLETENESS OF PARENTING PLAN

Daysha next argues that the district court erred in issuing an incomplete parenting plan. Specifically, Daysha argues that the court did not include a provision for the children's care in the event that Damon is deployed. We find no merit to this assignment of error.

The 2011 modification was necessitated in part because Damon's deployments made the summer visitation schedule unworkable. At the trial in the current modification, however, Damon testified that his moving for work was no longer a concern because he had transferred positions. The district court's order did not contain a provision for custody in the case of Damon's deployment.

The Nebraska Supreme Court addressed a similar issue in *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). In *Vogel*, the district court had included conditional visitation schedules which would go into effect if the mother moved overseas or if the father and mother moved to within 50 miles of one another. The Supreme Court determined that that portion of the court's order providing conditional visitation schedules should be vacated because "[t]he impact of such potential events on the children's best interests and the proper judicial response to the potential events . . . are better assessed at the time of their occurrence." *Id.* at 1039, 637 N.W.2d at 619-20.

Similarly here, Damon testified that he was no longer likely to be deployed because he had changed jobs. Although Damon's deployment was an issue during the 2011 modification, Damon's change of employment means that the prospect of him being deployed is currently speculative and uncertain. As in *Vogel, supra*, the impact of Damon's potential deployment on Oasis and Alexis' best interests would be better assessed at the time it occurs. Accordingly, the district court did not err in failing to include a provision for custody in the case of Damon's deployment.

## 5. CHILD SUPPORT

Daysha next argues that the district court erred in imposing a child support obligation on her of $167 per month. Daysha argues that her child support obligation should be waived because Damon caused her financial hardship. We find no merit to this assignment of error.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). The guidelines provide that in calculating child support, a court must consider the total monthly income of both parties. *Simpson v. Simpson*, 275 Neb. 152, 744 N.W.2d 710 (2008).

Here, the trial court relied on Daysha's testimony that her 2014 income was $15,000 annually ($1,250 per month) in calculating Daysha's child support obligation. Daysha does not take issue with the court's calculation or the figures used, but rather argues that she should not be required to pay child support because Damon has caused her financial hardship. Daysha testified that, although she was behind on her mortgage, she has realtor's and broker's licenses and is "perfectly capable of working." Given this evidence of Daysha's income, we cannot say that the trial court abused its discretion in refusing to deviate from the Child Support Guidelines and in ordering Daysha to pay child support of $167 per month.

## 6. BEST INTERESTS

Lastly, Daysha argues that the district court erred in concluding that modifying the decree to award Damon sole custody was in the children's best interests. Daysha points to evidence that she met the children's medical and educational needs when they were in her care. Daysha also argues that Damon was less involved in the children's activities and schooling prior to his having custody. We find no merit to this assignment of error.

Before custody may be modified based upon a material change in circumstances, it must be shown that the modification is in the best interests of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). Neb. Rev. Stat. § 43-2923 (Cum. Supp. 2014) requires a court, in determining custody and parenting arrangements, to consider certain factors relevant to the best interests of the minor child, including the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; the general health, welfare, and social behavior of the minor child; credible evidence of abuse inflicted on any family or household member; and credible evidence of child abuse or neglect or domestic intimate partner abuse. *Id.*

Daysha's argument ignores the impact that her behavior had on Oasis and Alexis, including having the police summoned to the home multiple times, telling the girls the police would trick them, being banned from the girls' school, hitting Alexis in the driveway, and the children being removed from the home following DHHS involvement. Considering the effect that Daysha's behavior had on her children, we cannot say that the district court abused its discretion in finding that modifying the decree to award Damon custody was in the children's best interests.

## VI. CONCLUSION

We find no merit to Daysha's assignments of error on appeal, and we affirm the district court's order.

AFFIRMED.

- 10 -